NOT FOR PUBLICATION

FILED

AUG 07 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-11-1565-DMkKi |
| JOSEPH H. PARKS and TIFFANY M. PARKS, | Bk. No. 08-13792-ES |
| Debtors. | Adv. No. 08-1404-ES |
| JOSEPH H. PARKS, | |
| Appellant, | |
| v. | **MEMORANDUM**[1] |
| ANGELUS BLOCK CO., INC., | |
| Appellee. | |

Argued and Submitted on July 19, 2012
at Pasadena, California

Filed - August 7, 2012

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Erithe A. Smith, Bankruptcy Judge, Presiding

Appearances:   Kevin E. Monson, Esq. argued for Appellant Joseph
               H. Parks; and Jon D. Cantor, Esq. of Dykema
               Gossett, LLP argued for Appellee Angelus Block
               Co., Inc.

Before:  DUNN, MARKELL, and KIRSCHER, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

The debtor/defendant/appellant Joseph H. Parks ("Debtor") appeals the bankruptcy court's judgment under § 523(a)(2)(A), excepting his debt to Angelus Block Co., Inc. ("Angelus") from his discharge.[2]  We AFFIRM.

<u>Factual Background</u>

From 2004 through 2008, the Debtor did business under the name Pool Construction Services ("PCS").  The Debtor performed construction services, including the construction of concrete block walls for residential projects.  As the operator of a small business, the Debtor periodically experienced difficulties with cash flow that he compensated for by working with customers who would pay the costs of materials "up front" and deduct those costs from the Debtor's billings.

Angelus is a supplier of concrete blocks and related materials to the construction industry.

Beginning in late 2005, Dennis Reiger ("Reiger") hired the Debtor to work on various projects Reiger was developing, including building concrete block walls for single family residential projects in Salton City, California (the "Salton City Project").  The Debtor's work on the Salton City Project encompassed building concrete block walls on more than 40 residential properties.  On or about December 16, 2005, the Debtor requested Angelus to supply concrete blocks and related materials for the Salton City Project.  From 2006 through 2008,

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Evidence are referred to as "FRE."

the Debtor completed about 95% of his scope of work for the Salton City Project.

Larry Lang ("Lang") operates under the name "Lang Construction" as a general contractor. Reiger sold Lang several vacant lots in Salton City, California. These lots were in the same development as the Salton City Project. Lang was looking to hire a subcontractor to build concrete block walls on his vacant lots, and Reiger referred the Debtor to him.

The Debtor was contacted by Lang in the summer of 2006 with a proposal that the Debtor build concrete block walls for Lang on his Salton City lots. As the various lots were in the same development as the Salton City Project, Lang specified that the Debtor should build the same type of walls for him that he was constructing for Reiger, so that the houses built on Lang's lots would blend in with the houses being constructed by Reiger.

In addition to the walls the Debtor was building for Reiger on the Salton City Project, the Debtor constructed concrete block walls for Lang at five building lots: 1556 N. Marina Drive (the first Lang lot developed), 1527 Valient, 2340 Falcon, 2344 Falcon and 2366 Falcon. The Debtor completed a Job Information Sheet, faxed to him by Angelus, for the Lang lot at 1556 N. Marina Drive but did not complete Job Information Sheets for any of the other lots on which the Debtor built concrete block walls for Lang. The four Lang lots, other than 1556 N. Marina Drive, hereafter are referred to as the "Lang Lots."

When Angelus delivered concrete blocks and other material to the Debtor in the Salton City area, the Debtor or his employee would meet the Angelus delivery truck and show the driver the

lot(s) at which the blocks and material were to be delivered and used. The Angelus employee then would unload the materials by forklift and deposit them on the subject lot(s). According to the Debtor, each such lot "was clearly identified by street and lot numbers."

During the period that Angelus was doing business with the Debtor, it was the customary practice of Angelus to obtain required information for the California preliminary lien notice ("California Preliminary Lien Notices") from its customers on a Job Information Sheet for each location to which Angelus products would be delivered. The required information included the identity of the owner of the project, the project address, the general contractor and any construction lender. Until the required information was obtained, material would not be delivered to the job site.

Reiger terminated the Debtor's services in January 2007 for reasons not specified in the record. On or about January 9, 2007, the Debtor failed to pay for some of the concrete blocks and related material he had ordered from Angelus. At the time Reiger terminated him, the Debtor owed Angelus approximately $60,000. The Debtor stated that the total amount for materials purchased from Angelus for the Lang Lots was approximately $15,500.

On or about February 7, 2007, Angelus caused mechanic's liens to be recorded with respect to various properties to which its products had been delivered at the Debtor's request and subsequently filed complaints to foreclose its mechanic's liens ("Mechanic's Lien Litigation"). During the Mechanic's Lien

-4-

Litigation, Angelus allegedly learned for the first time that concrete blocks and other materials that it understood had been delivered to Reiger projects in the Salton City area in fact had been delivered for walls to be constructed on the Lang Lots. Angelus accordingly was unable to recover for products delivered to the Lang Lots through the Mechanic's Lien Litigation.

The Debtor filed his chapter 7 bankruptcy petition on July 1, 2008. Thereafter, Angelus filed a timely adversary proceeding complaint ("Adversary Proceeding") to except the Debtor's debt to Angelus from discharge under § 523(a)(2)(A), (a)(4), and (a)(6). However, by the time of trial, Angelus only was pursuing its claim for relief under § 523(a)(2)(A) and a claim for attorney's fees.

The Adversary Proceeding was tried (the "Trial") before the bankruptcy court on January 24-25, 2011, with direct testimony presented by declarations and live testimony on cross-examination. Angelus argued and presented evidence to the effect that the Debtor knew that unless Angelus received proper information to complete the California Preliminary Lien Notices, it would not be able to pursue the owner of subject property(ies) for payment in the event that payment was not received from the Debtor. The Debtor admitted that he never informed Angelus who the owner of the Lang Lots was when he began to construct the concrete block walls on the Lang Lots using Angelus products. The Debtor also admitted that he was paid by Lang for the Angelus products he ordered and installed on the Lang Lots, but he did not pay Angelus for those materials. Angelus presented evidence that it suffered damages totaling $68,490.42 resulting from

Debtor's failure to disclose his use of Angelus products on the Lang Lots.

The Debtor presented a multi-prong defense to Angelus' claims. First, the Debtor testified that his agreement with Reiger was to the effect that when Angelus invoiced the Debtor for products used for the Salton City Project, Reiger paid for the products and deducted the payments to Angelus from the Debtor's invoices for the Salton City Project. When Lang contacted the Debtor to perform similar work on Lang's lots in the Salton City area, the Debtor testified that he approached Reiger and explained that he did not have the financial resources to cover the costs of products to be installed on Lang's lots. The Debtor further testified that he and Reiger agreed that the amount that would be due to the Debtor from Reiger for his labor on the Salton City Project would be sufficient to cover the cost of products for Lang's lots, and that Reiger would pay for the Angelus products used on Lang's lots, deducting the cost from the Debtor's invoices for the Salton City Project.

Reiger testified that no such agreement existed. Lang testified that he was not aware of any such agreement. Angelus also submitted declarations from two of its employees, its Credit Manager and its accounts receivable manager, denying that they ever were informed of such an agreement.

The Debtor also argued and testified that he or his employee always directed the Angelus employee delivering products to place them on the specific lot(s) where they were going to be installed. Since each lot was clearly identified by street and lot number, any failure by Angelus to obtain necessary

information for California Preliminary Lien Notices was its own fault and was not the result of any intentional failure to provide information by the Debtor.

Angelus countered with evidence that the Debtor provided information to complete California Preliminary Lien Notices for 82 separate lots in the Salton City Project and 1556 N. Marina Drive but did not provide such information for the four Lang Lots.

Finally, the Debtor testified that he was owed approximately $60,000 by Reiger for the Salton City Project when he was terminated that was not paid to him. The Debtor further testified that he had no money to obtain legal assistance to collect from Reiger and did not pursue collection. The amount owed to him by Reiger would have been enough to pay Angelus in full.

However, on cross-examination, the Debtor admitted that when he prepared and filed his bankruptcy schedules, he did not list any account receivable as owing from Reiger to him or PCS on his Schedule B.

The Debtor also argued that Angelus was paid for its products installed on the Lang Lots by Reiger. It was only after the Mechanic's Lien Litigation was initiated that payments for the products installed on the Lang Lots were backed out by Angelus as an accounting matter.

At the conclusion of the Trial, the bankruptcy court set a briefing schedule for post-trial memoranda. Both Angelus and the Debtor filed post-trial briefs, and Angelus filed a reply brief to the Debtor's post-trial brief.

On June 10, 2011, the bankruptcy court announced its findings and conclusions orally, finding in favor of Angelus on its claim to except its debt from the Debtor's discharge under § 523(a)(2)(A). Following the announcement of the bankruptcy court's oral findings of fact and conclusions of law, the Debtor requested that the bankruptcy court make additional specified fact findings. The bankruptcy court denied the Debtor's request for additional fact findings by order entered on July 19, 2011.

Judgment was entered in favor of Angelus on July 19, 2011, determining that the Debtor's debt to Angelus was excepted from his discharge and that the amount of damages was $63,870.87. The Debtor timely appealed, in light of the bankruptcy court's order extending the deadline to file a Notice of Appeal to October 14, 2011.

## Jurisdiction

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## Issues

1. Whether the Debtor can be subject to an exception to discharge in this case for failures to disclose information where there was no evidence of any affirmative misrepresentation by Debtor, and there was evidence that Angelus was paid for its products used on the Lang Lots.[3]

---

[3] This issue encompasses issues 1 through 4 and 6, as stated in Appellant's Opening Brief at pp. 1-2. Each of said issues, as stated by Debtor, is essentially a variation on the same theme, as discussed infra.

-8-

2. Whether the bankruptcy court erred in sustaining evidentiary objections to portions of the Declaration of Vedrana Spasojevic.

3. Whether the bankruptcy court erred in refusing to make the additional findings of fact requested by the Debtor.

Standards of Review

In an appeal from an exception to discharge judgment, we review the bankruptcy court's fact findings under the clearly erroneous standard and its conclusions of law de novo. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 382 (9th Cir. BAP 2011). However, the ultimate question of whether a particular debt is excepted from discharge is a mixed question of law and fact that we review de novo. Id.; Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004) (Mixed questions of law and fact are reviewed de novo when they require the bankruptcy court "to consider legal concepts and exercise judgment about values animating legal principles.").

Under the clearly erroneous standard, a reviewing court may not reverse the bankruptcy court's findings "simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985). The bankruptcy court's credibility determinations are entitled to substantial deference. Rule 8013; Thiara v. Spycher Bros. (In re Thiara), 285 B.R. 420, 427 (9th Cir. BAP 2002).

The bankruptcy court's evidentiary rulings are reviewed for abuse of discretion. Am. Express Travel Related Serv. Co., Inc. v. Vinhnee (In re Vinhnee), 336 B.R. 437, 442-43 (9th Cir. BAP 2005). Likewise, the bankruptcy court's decision to accept or

reject proposed findings of fact is reviewed for abuse of discretion. Cont'l Connector Corp. v. Houston Fearless Corp., 350 F.2d 183 (9th Cir. 1965).

We apply a two-part test to determine objectively whether the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). First, we "determine de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested." Id. Second, we examine the bankruptcy court's factual findings under the clearly erroneous standard. Id. at 1262 & n.20. We must affirm the bankruptcy court's fact findings unless those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id.

We may affirm on any basis supported by the record. Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

### Discussion

A. Generally Applicable Standards in a § 523(a)(2)(A) Case.

Section 523(a)(2)(A) provides that, "a discharge under . . . this title does not discharge an individual debtor from any debt – (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, . . . ." To prevail on a § 523(a)(2)(A) claim, a creditor must establish five elements: "'(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's

-10-

statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.'" Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009) (quoting Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)). The creditor bears the burden of proof to establish each of those five elements by a preponderance of the evidence. In re Slyman, 234 F.3d at 1085.

The exceptions to discharge in bankruptcy are interpreted narrowly in favor of the debtor. See, e.g., Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996). The relatively lenient burden of proof standard compared to the consistent admonition to interpret the standards for exceptions to discharge narrowly in the debtor's favor creates a tension that informs bankruptcy court decision making in § 523 cases.

B.    The Impact of Nondisclosure in the Absence of Affirmative Misrepresentations.

The Ninth Circuit has concluded that the nondisclosure of material information in the context of a business transaction will support an exception to discharge claim under § 523(a)(2)(A), analogizing such a situation to securities fraud. See Apte v. Japra (In re Apte), 96 F.3d 1319, 1323 (9th Cir. 1996).

In this case, Angelus alleged that the Debtor ordered Angelus products for installation on the Lang Lots, but the Debtor did not advise Angelus that its products in fact were being used on the Lang Lots and left Angelus with the impression that they were being used for lots in Reiger's Salton City

-11-

Project. Angelus further contended that the Debtor's failure to disclose his use of Angelus products on the Lang Lots resulted in damages to Angelus based on its reliance that its products were being directed to and for use on Reiger lots and consequent inability to file lien notices to protect its interests with respect to the Lang Lots.

The bankruptcy court found that the Debtor knew that he was giving the impression through nondisclosure that Angelus products were being delivered for installation on Reiger lots when he knew that the products were actually being used on the Lang Lots. The bankruptcy court further found that leaving that false impression was consistent with the Debtor's strategy to have Reiger pay for the Angelus products installed on the Lang Lots. However, the bankruptcy court also found that there was no agreement between Reiger and the Debtor for Reiger to pay for the Angelus products used on the Lang Lots.

The Debtor asserts the following arguments in support of his position that the bankruptcy court erred in its findings. We deal with each argument in turn.

1. <u>Debtor disclosed the installation of Angelus products on the Lang Lots</u>.

The Debtor argues there was no "fraud by concealment" in that the Debtor presented uncontradicted evidence that the Debtor (or Debtor's employee) pointed out to the Angelus employee delivering its products the particular lots on which its products were to be installed, including the Lang Lots. The short answer to Debtor's argument is that evidence is not inconsistent with the bankruptcy court's finding that the Debtor knowingly failed

-12-

to disclose that the owner of the Lang Lots was Lang, rather than Reiger.

    2.    <u>The Debtor had a duty to disclose facts material to his transactions with Angelus</u>.

The Debtor argues that he had no legal duty to disclose further information to Angelus in this case. That is contrary to applicable Ninth Circuit law. As stated in <u>In re Apte</u>:

> In determining the duty to disclose in the context of fraud under 11 U.S.C. § 523(a)(2)(A), we look to the common law concept of fraud at the time such language was added to the statute. [<u>Field v. Mans</u>, 516 U.S. 59, 69-70 (1995).] The Supreme Court in <u>Field</u> looked to the Restatement (Second) of Torts (1976) as "the most widely accepted distillation of the common law of torts" at the relevant time. <u>Id.</u> We do the same. Section 551 of that treatise provides:
>
> (1) One who fails to disclose to another <u>a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction</u> is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, <u>if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question</u>.
>
> (2) <u>One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,</u>
>
> . . .
>
> (e) facts basic to the transaction, if he <u>knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts</u>.

96 F.3d at 1324 (quoting Restatement (Second) of Torts § 551 (1976) (emphasis added)). <u>See, e.g.</u>, <u>Barnes v. Belice</u> <u>(In re Belice)</u>, 461 B.R. 564, 580 (9th Cir. BAP 2011).

Based on that standard, the bankruptcy court did not err in determining that the Debtor owed a duty to Angelus to disclose

-13-

facts material to the business transactions between them, including the fact that Lang owned the Lang Lots. This is an issue of federal law, and the Debtor's citation to a California law source (Witkin, <u>Summary of California Law</u> (10th ed. 2005) Torts, § 796 at 1151) is inapposite.

      3.   <u>There is a legal connection between Debtor's nondisclosures and Angelus' damages</u>.

The Debtor argues that the bankruptcy court erred in determining there was proximate causation between the Debtor's failures to disclose and the inability to serve timely proper California Preliminary Lien Notices because:

> 1) [Angelus] knew the exact address of each of the Lang properties where the building materials were delivered (by [Angelus]); 2) [Angelus] had the absolute and unfettered ability to refuse delivery of the materials until it had information sufficient to prepare and serve preliminary lien notices; 3) upon delivery of materials by a materialman, the materialman assumes and bears the legal burden to seek out all information necessary to prepare and serve preliminary notices; and 4) [Angelus] failed to serve preliminary lien notices for the Reiger properties known to [Angelus].

Appellant's Opening Brief at 16. Again, the Debtor's argument is inconsistent with controlling Ninth Circuit authority, cited by the Debtor. <u>See, e.g.</u>, <u>In re Apte</u>, 96 F.3d at 1323 ("[N]egligence in failing to discover a misrepresentation is not a defense to fraud.").

> Under the circumstances of this case, <u>involving primarily a failure to disclose</u>, positive proof of reliance is not a prerequisite to recovery. <u>All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact</u>.

<u>Id.</u> (citing <u>Affiliated Ute Citizens v. United States</u>, 406 U.S.

-14-

128, 153-54 (1972); Titan Group, Inc. v. Faggen, 513 F.2d 234, 239 (2d Cir. 1975)).

The bankruptcy court did not err in determining that there was a causative link between Debtor's nondisclosure of material facts and Angelus' damages in the context of this case. The Debtor's citation to California state law authorities in this case, interpreting and applying federal law, is unavailing.

4. <u>Angelus ultimately was not paid for its products delivered for installation on the Lang Lots</u>.

The Debtor argues that Angelus' own accounting records showed that its invoices for products used on the Lang Lots were paid. The bankruptcy court found that this was "technically true," but further found that payments by Reiger had been improperly applied at Debtor's direction to pay Angelus invoices for products delivered to the Lang Lots. These findings are consistent with the bankruptcy court's finding that no agreement existed between the Debtor and Reiger for Reiger to pay for Angelus products installed on Lang's lots. Based on the record before us, we cannot conclude that the bankruptcy court clearly erred in these findings.

5. <u>The bankruptcy court did not clearly err in discounting the Debtor's evidence that he honestly believed that Angelus products installed on the Lang Lots would be paid for by Reiger</u>.

The Debtor argues from his testimony that he honestly believed that there was an agreement between himself and Reiger that Reiger would pay for any Angelus products installed on Lang's lots, there was no fraud, and the bankruptcy court erred in finding that the Debtor's failures to disclose were

-15-

fraudulent.

The Debtor testified that he had an agreement with Reiger that Reiger would pay for the Angelus products used on Lang's lots, and Reiger would deduct any such payments from the amounts owed to the Debtor for labor on the Salton City Project. Reiger testified there was no such agreement; Lang testified that he was not aware of any such agreement; and two Angelus employees, its Credit Manager and its accounts receivable manager, testified that they never were informed of such an agreement.

In light of that conflicting evidence, the bankruptcy court "ultimately found [the Debtor's] testimony on this point unpersuasive," i.e., not credible.

As noted above, the bankruptcy court's credibility determinations, at the trial level, are entitled to substantial deference. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. at 574. We cannot conclude that the bankruptcy court clearly erred in discounting the Debtor's "honest belief" in the face of contrary testimony from Reiger, Lang and Angelus' employees.

C.   Evidentiary Issues Concerning the Declaration of Vedrana Spasojevic.

The Debtor argues that the bankruptcy court erred in sustaining Angelus' objections to admission of certain portions of the Declaration of Vedrana Spasojevic, an employee of Reiger, as not based on her personal knowledge or as inadmissible hearsay.

As noted above, we review the bankruptcy court's evidentiary

-16-

rulings for abuse of discretion. <u>Latman v. Burdette</u>, 366 F.3d 774, 786 (9th Cir. 2004). "To reverse on the basis of an erroneous evidentiary ruling, we must conclude <u>not only that the bankruptcy court abused its discretion, but also that the error was prejudicial</u>." <u>Johnson v. Neilson (In re Slatkin)</u>, 525 F.3d 805, 811 (9th Cir. 2008) (emphasis added).

The bankruptcy court struck the following statements from Ms. Spasojevic's declaration:

> Paragraph 5, beginning at line three ("First Statement"): "it appeared to me that [Debtor] was passing to ERA the amounts owed to Angelus for block being used by [Debtor] at his other projects." [lack of personal knowledge]
>
> Paragraph 5, beginning at line six ("Second Statement"): "I would then receive instructions from Roberto to go ahead and pay the amount requested by Angelus." [hearsay]
>
> Paragraph 6, beginning at line three ("Third Statement"): "but he would instruct me to pay it if there is still money left over of the amounts owed to [Debtor] or, at later times, he would tell me not to pay it, but after speaking with [Debtor] he would tell me to go ahead and pay it." [hearsay]

FRE 602, Lack of Person Knowledge, provides in relevant part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FRE 801 defines "hearsay," and FRE 802, Hearsay Rule, provides in relevant part: "Hearsay is not admissible except as provided by these rules . . . ."

The Debtor argues that the foundation for the First Statement was appropriately laid earlier in Ms. Spasojevic's declaration when she stated that among her job duties were "the review, payment, and paperwork for the materials used" at the Salton City Project. In light of her performance of those

duties, the Debtor argues that Ms. Spasojevic had sufficient personal knowledge to recognize when the Debtor was requesting payment for materials used beyond the materials required for the Salton City Project.

Angelus counters that there is no statement in Ms. Spasojevic's declaration indicating that she knew what quantities of concrete blocks and other materials were used on individual lots. She further does not state what knowledge she had, if any, regarding other projects on which the Debtor may have been working.

Frankly, the question as to whether the First Statement was properly excluded under FRE 602 is close. However, the relevance of the First Statement in the circumstances of this case is limited. The First Statement does not support the Debtor's defense that he had an agreement with Reiger for Reiger to pay for Angelus products installed on the Lang Lots. It does provide further support for the proposition that some Reiger payments were applied at Debtor's direction to pay Angelus invoices for products delivered to the Lang Lots. But, in that sense, it is cumulative of other evidence, including Paragraph 7 in Ms. Spasojevic's declaration, from which the bankruptcy court found as much.

Accordingly, even if the bankruptcy court erred in excluding the First Statement, the exclusion ultimately did not prejudice the Debtor and was no more than harmless error.

As to the Second and Third Statements, the Debtor argues that they reflected instructions Ms. Spasojevic was given and were introduced not to prove the truth of the facts asserted, but

-18-

rather to prove that Ms. Spasojevic was told the instructions. The Debtor further argues that the Second and Third Statements were introduced to show Ms. Spasojevic's state of mind when she was paying invoices presented by the Debtor. Finally, the Debtor argues that the Second and Third Statements provide evidence inconsistent with Reiger's testimony that he never knowingly authorized payment for Angelus products used on the Lang Lots.

Considering each of the subject statements, the Second Statement describes communications not with Reiger but with a third person employed by Reiger, i.e., double hearsay. It does not fit within any of the specific exceptions to hearsay exclusion set forth in FRE 803. It further does not satisfy the foundation requirements of the residual hearsay exception in FRE 807 because it does not tend to establish material facts and is not particularly probative. It is Reiger's state of mind that is relevant, not Ms. Spasojevic's.

The Third Statement does relate to communications between Ms. Spasojevic and Reiger, but it also does not fall within any of the specific exceptions to hearsay exclusion in FRE 803. Again, Ms. Spasojevic's state of mind, as opposed to Reiger's, simply is not relevant.

On the other hand, the Third Statement does tend to establish that, on occasion, when questions arose in Ms. Spasojevic's mind as to the appropriateness of making payments to the Debtor when he requested advances or when she noticed discrepancies in his billings, Reiger would authorize some payments, at times, only after speaking with the Debtor. However, such evidence is not probative with respect to the

-19-

Debtor's claimed defense that Reiger had an express agreement with the Debtor to pay for Angelus products used on Lang's lots and deduct such payments from the Debtor's labor billings. It likewise is not particularly probative as inconsistent with Reiger's statement that he never knowingly paid for Angelus products installed on the Lang Lots.

We ultimately conclude that the bankruptcy court did not abuse its discretion in excluding the Second and Third Statements as inadmissible hearsay.

D.  Proposed Additional Fact Findings.

The Debtor argues that the bankruptcy court's oral findings and conclusions were inadequate to provide a "clear understanding" of the basis for its decision in this case, and the bankruptcy court further erred in refusing to consider the additional findings of fact proposed by the Debtor.

As to the first point, it is clear to us from review of the transcript of the bankruptcy court's oral findings and conclusions that the bankruptcy court cited and clearly understood the applicable legal standards. It also is clear to us that in applying the applicable legal standards based on the evidence before it, the bankruptcy court found that the Debtor knowingly failed to disclose information material to some of his business transactions with Angelus, with the intent to leave a false impression on which Angelus justifiably relied, proximately causing damages to Angelus. The Debtor has not appealed the amount of damages found by the bankruptcy court. Accordingly, we conclude that the bankruptcy court's oral findings and conclusions were adequate to provide an explanation for its

-20-

decision, and were supported by evidence in the Trial record. The Debtor's argument lacks merit.

As to the second point, as correctly pointed out by the Debtor, a trial court does have a "duty to carefully consider, weigh and determine the accuracy of . . . proposed findings, and whether they are supported by the evidence in the record . . . ." Cont'l Connector Corp. v. Houston Fearless Corp., 350 F.2d at 187.

After the bankruptcy court had announced its oral findings and conclusions, it authorized the parties to submit further proposed findings and conclusions consistent with its oral ruling. Subsequently, the Debtor submitted thirty-five detailed proposed additional findings.

The bankruptcy court ultimately declined to adopt the Debtor's additional proposed fact findings, but the Debtor is simply wrong in asserting that the bankruptcy court refused to consider them.

In its Order Denying Request to Adopt Additional Findings of Fact ("Proposed Fact Findings Order"), the bankruptcy court explicitly declined to adopt the Debtor's additional proposed fact findings "as unnecessary." The bankruptcy court necessarily reviewed and considered the Debtor's proposed additional fact findings in arriving at that conclusion. The bankruptcy court then went on to state in the Proposed Fact Findings Order that,

> The Court did not, as represented in the Request, invite the parties to submit "additional" findings; rather the Court, at the June 10, 2011 oral ruling hearing, advised the parties that they could submit written findings and conclusions that reflected the court's oral findings and conclusions as stated on the record. (emphasis in original).

-21-

Based on the record before us, we perceive no abuse of discretion in the bankruptcy court's decision not to adopt the Debtor's proposed additional fact findings in these circumstances.

## Conclusion

For the foregoing reasons, we AFFIRM.